**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LEROY HARRIS, JR.,                              :

                    Plaintiff,          :     Civil Action No. 10-2402 (SRC)

                          :

                          :

          v.                      :     **OPINION**

CHRIS CHRISTIE, et al.,                         :

                Defendants.         :

**APPEARANCES:**

    LEROY HARRIS, JR., Plaintiff pro se
    Special Treatment Unit
    P.O. Box 190
    Avenel, New Jersey 07001

**CHESLER**, District Judge

    Plaintiff, Leroy Harris, Jr., an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24, et seq., seeks to bring this action in forma pauperis. Based on his affidavit of indigence, the Court will grant plaintiff's application to proceed in forma pauperis ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint.

    At this time, the Court must review the Complaint, pursuant to 28 U.S.C. § 1915(e)(2), to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary

relief from a defendant who is immune from such relief.  For the
reasons set forth below, the Court concludes that the Complaint
should be dismissed without prejudice at this time.

## I.  BACKGROUND

Plaintiff, Leroy Harris, Jr. ("Harris"), brings this civil
rights action, pursuant to 42 U.S.C. § 1983, against the
following defendants: Chris Christie, the Governor of New Jersey;
Paula Dow, Attorney General for the State of New Jersey; Gary
Lanigan, Commissioner of the New Jersey Department of Corrections
("NJDOC"); Jennifer Velez, Commissioner of the New Jersey
Department of Human Services ("NJDHS"); Steven Johnson, NJDOC
Administrator; and Merril Main, NJDHS Administrator.  (Complaint,
Caption and ¶¶ 4b-4g).  The following factual allegations are
taken from the Complaint, and are accepted for purposes of this
screening only.  The Court has made no findings as to the
veracity of plaintiff's allegations.

Harris alleges that, on March 17, 2010, a community meeting
was held by defendant, Administrator Johnson, with the residents
at the Kearny facility to discuss an impending transfer of the
residents to the East Jersey State Prison ("EJSP") administrative
segregation unit ("Ad Seg Unit").  The residents complained that
they would be in a 23-hour lock-down facility even though they
are civilly committed persons under the SVPA, not prisoners.
Johnson told plaintiff that he would have to take his mattress

with him when he was moved.   (Compl., Statement of Claims at ¶ 6).

On March 25, 2010, a memo was issued to the residents informing them that all food, clothing and other packages could not be ordered for delivery to Kearny because a change of address to the Avenel facility necessary to facilitate the move to EJSP. Residents were told that the last day for delivery of general packages would be April 9, 2010, and for delivery of food packages on April 23, 2010.  (Id.).

On March 26, 2010, Harris attended his therapy session with Dr. Izer and Dr. Vega, who both told plaintiff that once he arrived at EJSP, there would be no therapy for at least two to four weeks while the NJDOC and NJDHS "figure out" how to "reorganize group therapy" at EJSP.  (Id.).

On April 7, 2010, Harris was informed by a NJDHS staff member that the phones at the Kearny facility will be turned off on May 1, 2010, in anticipation and preparation for the transfer to EJSP.  Harris complains that this will deprive him of contact with his family for weeks.  (Id.).  On April 9, 2010, Harris was told that the NJDOC Central Transport would be moving the residents starting around May 7, 2010.  (Id.).

On April 13, 2010, Harris attended his group therapy session at the Kearny facility.  At that time, he was told by the group therapists that group therapy will be cancelled for a week at

Kearny while the therapists receive training to function in a prison environment.  (<u>Id</u>.).

On April 14, 2010, another community meeting was held for the residents concerning the transfer to EJSP.  The residents were told that they would be moving between May 10th and May 15th, 2010, and that they would have to throw away their personal belongings to facilitate and accommodate the move.  At this meeting, defendant Merril Main also told plaintiff that therapy would be on a "stand-still" for a month or more while the NJDOC and NJDHS "figures out" how recreation, yard time, therapy and visitation will take place at EJSP.  Consequently, plaintiff would be "idle" during the time that the administrators renovate and fix the Ad Seg Unit at EJSP to make it suitable for civilly committed persons.  Main told plaintiff that some of the therapists will have their offices in the cells to check on the atmosphere and behavior of the residents during the idle time.  Harris complains that this is not therapeutic and is harmful to his health mentally and psychologically.  (<u>Id</u>.).

Also on April 14, 2010, Chief Buchannan told Harris that he would be housed under the title of Special Treatment Unit, but that Harris would actually be confined on EJSP property.  Buchannan would not answer Harris' question concerning whether the unit would have a "fence-wire" inside the EJSP.  On April 15, 2010, Buchannan was at the Kearny facility and told plaintiff to

pack his personal belongings and load it on the transport truck for the move.  Buchannan also told Harris that upon the residents' arrival at EJSP, trained drug dogs would be there to sniff the residents' personal property for contraband, such as drugs and cell phones, pursuant to prison policy.  (Id.).

Harris next alleges that the prison kitchen at EJSP will be cooking and supplying the meals for the SVP residents, so Harris is concerned that prisoners will be preparing and tainting his food because of their alleged dislike of civilly committed persons.  (Id.).

Finally, Harris alleges that he was told that the EJSP Ad Seg Unit has no circulating air, cold showers, and that the residents would have to eat through port holes in cells.  He was further told that he would be on 23-hour lock-down with no mail or packages.  (Compl., ¶¶ 4f, 4g).

Harris asks that he be provided with "the proper treatment of a federally funded facility."  He also seeks an unspecified amount in compensatory damages for the mental anguish and stress that he is suffering in being transferred to a prison facility.  (Compl., ¶ 7).

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a civil action where the litigant is proceeding in forma pauperis. Specifically, the court is required to identify cognizable claims and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Harris is proceeding in forma pauperis in this matter, this action is subject to sua sponte screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions."  Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490 U.S. 319,

6

325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights.  Id.  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed.R.Civ.P. 8(a)(2).[1]  Citing its recent opinion in Bell
Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the
proposition that "[a] pleading that offers 'labels and
conclusions' or 'a formulaic recitation of the elements of a
cause of action will not do,' "Iqbal, 129 S.Ct. at 1949 (quoting
Twombly, 550 U.S. at 555), the Supreme Court identified two
working principles underlying the failure to state a claim
standard:

> First, the tenet that a court must accept as true all of the
> allegations contained in a complaint is inapplicable to
> legal conclusions.  Threadbare recitals of the elements of a
> cause of action, supported by mere conclusory statements, do
> not suffice ... .  Rule 8 ... does not unlock the doors of
> discovery for a plaintiff armed with nothing more than
> conclusions.  Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss.
> Determining whether a complaint states a plausible claim for
> relief will ... be a context-specific task that requires the
> reviewing court to draw on its judicial experience and
> common sense.  But where the well-pleaded facts do not
> permit the court to infer more than the mere possibility of
> misconduct, the complaint has alleged-but it has not
> "show[n]"-"that the pleader is entitled to relief."  Fed.
> Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

> a court considering a motion to dismiss can choose to begin
> by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

---

[1]  Rule 8(d)(1) provides that "[e]ach allegation must be
simple, concise, and direct.  No technical form is required."
Fed.R.Civ.P. 8(d).

<u>Iqbal</u>, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id</u>. at 1948.  The Supreme Court's ruling in <u>Iqbal</u> emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible.  <u>Id</u>. at 1949-50; <u>see also</u> <u>Twombly</u>, 505 U.S. at 555, & n.3; <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that <u>Iqbal</u> provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957),[2] that applied to federal complaints before <u>Twombly</u>.  <u>Fowler</u>, 578 F.3d at 210.  The Third Circuit now requires that a district court must conduct the two-part analysis set forth in <u>Iqbal</u> when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [<u>Iqbal</u>, 129 S.Ct. at 1949-50].

---

[2]  In <u>Conley</u>, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  <u>Id</u>., 355 U.S. at 45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id.]   In other words, a complaint must do more than allege the plaintiff's entitlement to relief.   A complaint has to "show" such an entitlement with its facts.   See Phillips, 515 F.3d at 234-35.   As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'"   Iqbal, [129 S.Ct. at 1949-50].   This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of Plaintiff, even after Iqbal.   See Erickson v. Pardus, 551 U.S. 89 (2007).   Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).

### III.   SECTION 1983 ACTIONS

Harris brings this action pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

10

> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

IV. <u>THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT</u>

The New Jersey SVPA, <u>N.J.S.A.</u> 30:4-27.24 *et seq.*, provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP"). <u>N.J.S.A.</u> 30:4-27.26. The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, <u>N.J.S.A.</u> 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment. <u>N.J.S.A.</u> 30:4-27.34(b). The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in consultation with of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." <u>N.J.S.A.</u> 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs.  N.J.S.A. 30:4-27.25.  The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed.  Id.  The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings.  N.J.S.A. 30:4-27.35.  A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge.  N.J.S.A. 30:4-27.36.

## V.  ANALYSIS

### A.  Transfer to Prison Facility Claim

The principal claim asserted in Harris's Complaint is that his transfer to a prison facility, as a civilly committed person under the SVPA, is unconstitutional.  Harris seeks to prevent his transfer accordingly.

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme Court of the United States examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act

12

called for the confinement of sexually violent predators in a secure facility because they were dangerous to the community. Id., 521 U.S. at 363-64.   Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system.   However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals.   Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment.   Id., 521 U.S. at 363, 364, 365-368.   Thus, the Supreme Court held that involuntary confinement under Kansas' SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly committed.   Id., 521 U.S. at 368-69.   See also Seling v. Young, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in Hendricks and Seling, respectively.[3]   See Bagarozy v. Goodwin, Civil Action No. 08-468

_____

[3]   Recently, the Supreme Court held constitutional under the Necessary and Proper Clause, a federal statute that allowed a district court to order the civil commitment of a sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released. United States v. Comstock, No. 08-1224, __ U.S. __, 130 S.Ct. 1949 (May 17, 2010).   Although these civilly committed persons remained confined at a federal prison, namely, FCI Butner, the Court did not address their place of

(SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002). Therefore, this Court finds that Harris's transfer, with the SVP residents of the Kearny facility, to a segregated unit in the East Jersey State Prison does not, in and of itself, violate the U.S. Constitution's Due Process Clause.  Moreover, because the transfer has now been effected, plaintiff's claim for injunctive relief to prevent the transfer to EJSP is now rendered moot. Accordingly, the claim that plaintiff's transfer to a segregated unit within a prison facility is unconstitutional will be dismissed for failure to state a cognizable claim of a constitutional deprivation.

B.  Conditions of Confinement Claim

     Although plaintiff's transfer to a segregated unit within a prison facility is not, in and of itself, a constitutional violation, Harris makes additional allegations concerning the conditions of confinement at the EJSP facility.  For instance, he complains that he will be housed in a 23-hour lock-down facility. However, Harris also states that Mr. Main had told the residents that there would be a period of time needed to resolve issues of recreation and yard time, and to renovate the space to make suitable living quarters for the civilly committed residents. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more

---

civil confinement as being unconstitutional.

considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). He also complains that there are allegations concerning the lack of air circulation, cold showers, and meals to be prepared and supplied by prisoners.

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[4] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22. Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307. The Constitution is not concerned with de minimis restrictions on patients' liberties. Id. at 320. Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." Seling, 531 U.S. at 265. While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061

---

[4] In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose. 441 U.S. 520, 535-39, (1979).

(8th Cir. 2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Harris's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a 23-hour lock down facility.  This restriction also involves limited recreation yard time and visitation.  However, Harris acknowledges in his Complaint that these conditions are merely temporary until the "Ad Seg Unit" is renovated for the SVP residents.  At most, the administrators told plaintiff and the other SVP residents that it would take a month or two to complete renovations to accommodate the less restrictive and treatment-oriented environment suitable for civilly committed SVPs.

Moreover, even if plaintiff has temporary restrictions in yard activity and mobility throughout the facility, the Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme.  See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[5] to segregated confinement of civilly committed SVPs).  See also Thielman v. Leean, 282 F.3d

---

[5] In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

478 (7th Cir. 2002)(likewise extending Sandin to civil commitment settings).  As stated above, Harris's complaints about the restrictions on his confinement are minimal and clearly temporary.

Harris also alleges that he was told that there was no air circulation at EJSP, the showers would be only cold water, and that prisoners would be preparing and providing the residents' meals.  These allegations are merely speculative, as plaintiff was not confined at EJSP at the time he filed this Complaint.

Nevertheless, these alleged conditions clearly bear no reasonable relation to the purpose for which Harris and the other SVP residents are committed, and to the extent these uninhabitable living conditions are not addressed with the renovations, Harris may have a viable Fourteenth Amendment conditions of confinement claim.  In this regard, the Court is guided by the Third Circuit's determination in the context of a Fourteenth Amendment claim, as set forth in Hubbard v. Taylor, 538 F.3d 229 (3d Cir. 2008)("Hubbard II").  In Hubbard II, the Third Circuit held that requiring pretrial detainees (claims by pretrial detainees, like civilly committed persons, are governed by the Fourteenth Amendment) to sleep on a mattress on the floor in a cell holding three inmates for three to seven months did not constitute punishment in violation of the Fourteenth Amendment. 538 F.3d at 234-35.  The court rejected the Second Circuit's per se ban on the practice in Lareau v. Manson, 651 F.2d 96 (2d Cir.

1981), and instead considered it "as part of the 'totality of the circumstances within [the] institution.'" Hubbard II, 538 F.3d at 235 (quoting Hubbard v. Taylor, 399 F.3d 150, 160 (3d Cir. 2005)("Hubbard I")[6]). The court then concluded that although the plaintiffs "did spend a substantial amount of time on floor mattresses," they had access to large day rooms and the record did not substantiate plaintiffs' claims that the use of floor mattresses caused disease or led to the splashing of human waste on the plaintiffs. Id. After noting the efforts made by the jail to improve conditions, the court found "that Plaintiffs were not subjected to genuine privations and hardship over an extended period of time for purposes of their due process claim." Id.

Based on the allegations in Harris' Complaint, all of which are speculative because plaintiff had not yet been transferred to EJSP when he made these allegations concerning the poor living conditions at EJSP, this Court finds that plaintiff's allegations concerning the "totality of circumstances" surrounding his confinement are not sufficient at this time to suggest that he has been "subjected to genuine privations and hardship over an extended period of time for purposes of [his] due process claim." See Hubbard II, 538 F.3d at 235. Therefore, the Court will

---

[6] Hubbard I is the predecessor to Hubbard II. In Hubbard I, the Third Circuit remanded plaintiffs' case to the district court to apply the correct standard for a conditions of confinement claim by a detainee under the Fourteenth Amendment. 399 F.3d at 166-67. The district court subsequently ruled in defendants' favor and plaintiffs appealed, resulting in Hubbard II. 538 F.3d at 230.

18

dismiss the conditions of confinement claim, without prejudice,
for failure to state a claim at this time.   To the extent that
these conditions continue for a longer period of time than
suggested by the NJDHS and NJDOC administrators, Harris may seek
leave to re-open this case and file an amended pleading.[7]

C.   Interference with the Mail Claim

Harris next appears to assert that the delivery of his mail
to the Avenel address, rather than directly to him at EJSP,
violates his First Amendment rights.   Specifically, in ¶ 4g of
his Complaint, Harris alleges that he will not receive mail or
packages at EJSP.   Inmates have a limited liberty interest in
their mail under the First and Fourteenth Amendments.   Jones v.
Brown, 461 F.3d 353, 358 (3d Cir. 2006), cert. denied, 549 U.S.
1286 (2007).[8]   However, an inmate's constitutional right to send

---

[7]   Should plaintiff so choose to amend his Complaint to cure
the deficiencies noted herein, pursuant to Federal Rule of Civil
Procedure 15, Harris should note that when an amended complaint
is filed, the original complaint no longer performs any function
in the case and "cannot be utilized to cure defects in the
amended [complaint], unless the relevant portion is specifically
incorporated in the new [complaint]."   6 Wright, Miller & Kane,
Federal Practice and Procedure § 1476 (2d ed. 1990) (footnotes
omitted).   An amended complaint may adopt some or all of the
allegations in the original complaint, but the identification of
the particular allegations to be adopted must be clear and
explicit.   Id.   To avoid confusion, the safer course is to file
an amended complaint that is complete in itself.   Id.

[8]   In Jones v. Brown, the United States Court of Appeals for
the Third Circuit held that the legal mail policy of state prison
in opening legal mail outside the presence of the inmate violated
the inmate's First Amendment right to freedom of speech, and was
not reasonably related to prison's legitimate penological
interest in protecting health and safety of prisoners and staff.
461 F.3d at 358.   The Third Circuit also has held that "a pattern

and receive mail may be restricted for legitimate penological
interests.  See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989);
Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner, the Supreme
Court of the United States found that a prison regulation
infringing on an inmate's constitutional rights is valid so long
as it is reasonably related to a legitimate penological interest.
Id. at 89.  The Court established a balancing test pursuant to
which courts analyze prohibitions on prisoners' exercise of their
constitutional rights by considering the following four factors:
(1) whether prohibiting an inmate from exercising a
constitutional right is rationally related to a legitimate
governmental interest; (2) whether there are alternative means of
exercising that right; (3) what effect accommodation of the
interest would have on guards, other inmates, and the allocation
of prison resources; and (4) whether there are ready alternatives
available that continue to serve the prison's interest without
impinging constitutional rights.  Turner, 482 U.S. at 89-91.  The
Court also recognized that deference should be given to the

---

and practice of opening properly marked incoming court mail
outside an inmate's presence infringes communication protected by
the right to free speech.  Such a practice chills protected
expression and may inhibit the inmate's ability to speak,
protest, and complain openly, directly, and without reservation
with the court."  Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir.
1995) (applying the Turner analysis), implied overruling on other
grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d
Cir. 1997).  Thus, the assertion that legal mail is intentionally
opened and read, delayed for an inordinate period of time, or
stolen may state a First Amendment claim.  See, e.g., Antonelli
v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v.
Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.  Id.

The United States Court of Appeals for the Third Circuit has applied Turner in analyzing constitutional claims by civilly committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. March 29, 2007)(applying Turner in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied Turner when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[9]  See Willis v. Smith, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying Turner to SVP claims concerning mail handling procedures); Ivey v. Mooney, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30, 2008)(applying Turner, but noting that a civil confinement is significantly different from a criminal confinement); Francis v. Watson, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing cases that have applied Turner in cases involving civilly confined persons); Marsh v. Liberty Behavioral Health Care, Inc., 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), aff'd 330 Fed.

---

[9]  Essentially, the First Amendment analysis under Turner mirrors the due process analysis under Youngberg; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside.  See Beaulieu v. Ludeman, 2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent with Youngberg because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

In Rivera, the Third Circuit affirmed the district court's ruling that a facility housing civilly committed SVPs has a legitimate interest in both the safety of its facility and the rehabilitation of its patients. Rivera, 224 Fed. Appx. at 151 (citing Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999)("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.")). Specifically, the court upheld as constitutional the STU's policy that allows staff to open packages not marked as "legal mail" to assure that the packages do not contain contraband (i.e., items either harmful to staff and residents, or detrimental to rehabilitation). The court found that plaintiff was free to send and receive mail so long as the content of his mail was not sexually explicit. Moreover, the Third Circuit found no error in the district court's conclusion that there were no ready alternatives to mail security and that the STU's policy appeared to be the only viable alternative, thus supporting the reasonableness of the mail policy. Rivera, 224 Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute that the staff at EJSP, where plaintiff and other SVP residents are newly housed, has a legitimate interest in both the safety of its facility and rehabilitating its patients. As noted above,

22

these civilly committed persons are convicted sexual predators, which makes safety at EJSP a very important concern. The staff clearly must determine if any items coming through the mail pose a threat to the safety of the staff or the other residents. They also must decide if any of the materials passing through the mail could be detrimental to a resident's therapy. Consequently, as set forth by the Supreme Court and the Third Circuit, the Court must defer to the prison officials when it comes to issues of managing a safe and operational prison facility. In this case, delivery of letters and packages at the Avenel facility located close by, where the staff is trained with respect to SVP issues unlike the general NJDOC staff at EJSP, assures that harmful materials are not being passed through the mail, but also allows for specialized treatment regarding SVP residents. This new policy, which appears to be preliminarily instituted because of the recent transfer of the SVP residents to EJSP, clearly bears a rational relationship to both interests discussed above. Moreover, in his interference with the mail claim, Harris does not allege a single incident where his mail has not been delivered or received.[10]  Rather, his only complaint seems to be that his mail will be sent to another facility instead of EJSP where he now resides. Harris does not articulate a claim that

_____

[10]  A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation. Morgan v. Montayne, 516 F.2d 1367 (2d Cir. 1975), cert. denied, 424 U.S. 973 (1976).

prison officials are intentionally delaying his mail.  Therefore, the Court will dismiss this claim without prejudice at this time, and allow Harris to file an amended pleading, consistent with the pleading requirements of Rule 8(a)(2) and amended pleading requirements of Rule 15 of the Federal Rules of Civil Procedure, as discussed in fn. 10 of this Opinion, supra, if Harris in fact wishes to pursue such a claim.

D.   Deprivation of Property Claim

Harris also appears to be asserting a claim that he has been, or will be, deprived of his personal property in violation of his constitutional rights.

The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]"  The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  Zappan v. Pennsylvania Board of Probation and Parole, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard.").  Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process.  See Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002)

("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Harris must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, Harris fails to specify what property the NJDOC and NJDHS officials would not or did not permit him to keep.  Moreover, the limitations allegedly placed by NJDOC and NJDHS officials on personal belongings to be moved with the transfer of the residents from the Kearny facility to EJSP were neither arbitrary or capricious, but plainly were implemented in order to address the logistics of the move and to further a legitimate

25

goal of maintaining a safe and organized mass transfer of SVPs from one facility to another.  In this regard, Harris simply has not demonstrated a constitutionally-recognized property interest in the continued possession of unrestricted personal property necessary to satisfy the threshold requirement of a deprivation of property interest.  See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn. Jan. 8, 2010).

Furthermore, to the extent that Harris was deprived of personal property as a result of the transfer to EJSP, he has a post-deprivation remedy.  Property loss caused by the intentional acts of government officials does not give rise to a procedural due process claim under § 1983 where a post-deprivation remedy satisfying minimum procedural due process requirements is available under state law.  See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856.[11]  The New Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-

---

[11]  In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Supreme Court explained, however, that post-deprivation remedies do not satisfy the Due Process Clause if the deprivation of property is accomplished pursuant to established state procedure rather than through random, unauthorized action.  455 U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United States v. James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in "extraordinary situations" such as routine deduction of fees from a prisoner's account even without authorization, post-deprivation remedies may be adequate).

deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government. See Holman, 712 F.2d at 857; Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by Harris here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

E.   Unlawful Search Claim

Harris next asserts that upon his arrival at EJSP, he and the other residents will be subjected to a search of their personal property by trained drug dogs sniffing for contraband, such as drugs and cell phones. Harris admits that this is standard NJDOC prison policy. It would appear that Harris is asserting that as a civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV. Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). "Thus, the permissibility of a particular

27

practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529. The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530. The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.... [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted). The same conclusion was reached with respect to pretrial detainees other than convicted prisoners. See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).[12]

---

[12]   In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally.  See Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose

---

inmate's body.  In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." <u>Jones v. Blanas</u>, 393 F.3d 918, 932 (9th Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. <u>Id</u>.

Here, with respect to his Fourth Amendment claim, Harris' primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation. Applying the balancing test employed by <u>Wolfish</u>, this Court finds that the alleged, prospective search of personal property by dogs sniffing for contraband is plainly reasonable and does not violate Harris' Fourth Amendment rights. First, such a search is not highly intrusive and does not involve a physical touching of plaintiff's person. Even if plaintiff were subject to a personal search, the purpose of the search as alleged does not violate the Fourth Amendment. <u>See</u> <u>Semler v. Ludeman</u>, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope

of searches of the general public at airport security checkpoints).  See also Serna, 567 F.3d at 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones.

Moreover, there are no allegations that the prospective search is to be conducted in a menacing manner.  See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).  Harris admits that the search is a NJDOC policy when persons arrive at a prison facility, thus suggesting that the dog search for contraband is to be conducted for the purpose of prison security and the effective management of EJSP to contain and prevent contraband from entering the facility grounds.  Accordingly, this Court will dismiss Harris' Fourth Amendment unlawful search claim at this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a cognizable claim under § 1983.  However, this dismissal is without prejudice to Harris seeking to re-open his case with an amended Complaint alleging additional facts to support an unlawful search claim.

F.   Interruption of Treatment Claim

Finally, Harris appears to assert that therapy/treatment sessions will be completely denied because of the transfer to EJSP.  He contends that he will be denied the right to adequate

treatment and reasonable care applicable to civilly committed SVPs, in violation of the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution, § 1, guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." Palko v. Conn., 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry. Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Substantive due process also protects against government conduct that is so egregious that it "shocks the conscience," even where the conduct does not implicate any specific fundamental right. See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny and will be upheld if they are "narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). However, regulations not implicating fundamental rights (in other words, those claims attacking particularly egregious or arbitrary governmental actions) are analyzed under the deferential standard referred to as the rational basis review,

and will generally succeed only if the government action shocks the conscience.  See Glucksberg, 521 U.S. at 728.

With respect to Harris's claim, it appears that he is asserting that he has a fundamental right to adequate treatment as a civilly committed sex offender.  The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment.  Specifically, the Supreme Court held that there is a constitutional right of mentally disabled persons confined at a state institution to "minimally adequate habilitation", self-care treatment or training to the extent necessary to protect their recognized fundamental rights to safety and freedom from physical restraints.  Youngberg, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated.  Youngberg, 457 U.S. at 320.  Although restrictions burdening a fundamental right generally receive strict scrutiny, in Youngberg, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions.  Id. at 322. Consequently, the Court concluded that "the Constitution only requires that the courts make certain that professional judgment

33

was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321 (internal quotation and citation omitted). Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that New Jersey's unique former statutory scheme for sex offenders that predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of both procedural and substantive due process analyses. 288 F.3d at 545. Leamer was not a civilly committed sex offender like plaintiff here. Rather, Leamer was a convicted sex offender whose confinement and treatment were inextricably linked pursuant to statute. The sentencing court had classified Leamer as having a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point. Leamer could not reduce his sentence through good behavior credits, parole policies or other credits. Instead, he could only shorten

34

his incarceration through successful therapy, which was an
"inherent and integral element" of the statutory scheme.
Consequently, the Third Circuit found that deprivation of
treatment would be a grievous loss not emanating from the
sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the
violation of recognized fundamental rights to safety and freedom
from physical restraints, this Court finds the Third Circuit's
holding in Leamer to clearly extend to an involuntarily committed
sex offender under New Jersey's SVPA.  Like Leamer, the length of
Harris's confinement under the SVPA is predicated on his response
to treatment.  Indeed, the provisions of the SVPA explicitly
recognize New Jersey's obligation to provide treatment to SVPs
for their eventual release based on successful therapy.  See
N.J.S.A. 30:4-27.32(a)("If the court finds by clear and
convincing evidence that the person needs continued involuntary
commitment as a sexually violent predator, it shall issue an
order authorizing the involuntary commitment of the person to a
facility designated for the custody, care and **treatment** of
sexually violent predators")(emphasis added); N.J.S.A. 30:4-
34(b)("The Division of Mental Health Services in the Department
of Human Services shall provide or arrange for treatment for a
person committed pursuant to this act.  Such treatment shall be
appropriately tailored to address the specific needs of sexually
violent predators."); N.J.S.A. 30:4-27.36(a)(At any time during
the involuntary commitment of a person under this act, if the

person's treatment team determines that the person's mental condition has so changed that the person is not likely to engage in acts of sexual violence if released, the treatment team shall recommend that the Department of Human Services authorize the person to petition the court for discharge from involuntary commitment status"); see also Kansas v. Hendricks, 521 U.S. 346, 367 (1997)(concluding from similarly-worded provisions of Kansas SVP Act that "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery ....")(alterations in original)(internal citations omitted).

Therefore, based on Youngberg and Leamer, this Court concludes that Harris's liberty interest in treatment is fundamental and cognizable for purposes of both procedural and substantive due process analyses. But see Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted that Youngberg did not establish a right for the civilly committed to treatment per se; the Supreme Court only "held that the Constitution required only such 'minimally adequate training ... as may be reasonable in light of [the] liberty interest[ ] in safety and freedom from unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322). In Bailey, the Eighth Circuit concluded that plaintiff had no right to "psychiatric treatment to overcome a 'sexual offender condition'" because he "was neither in danger during his civil commitment nor was he subject to any restraints beyond the

ordinary incidents of any involuntary confinement." Id. at 1153, 1154.  Citing Bailey, district courts in the Eighth Circuit have since concluded that civilly committed sexual predators have no substantive due process right to mental health treatment, adequate or otherwise.  See Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010)("Because this Court has not recognized a constitutional right to effective 'treatment' in the context of civilly committed sex offenders, Plaintiffs [alleging substantive due process violations through ineffective treatment] have failed to allege a due process claim ....")(citing Nicolaison v. Ludeman, 2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in ultimately concluding that involuntarily committed sex offender's right to treatment is not "clearly established" for purposes of 28 U.S.C. § 2254(d)(1), that Youngberg "only recognized a right to 'minimally adequate' treatment that reduces the need for restraints," and not a "comparable right to treatment that facilitates release")).

Nevertheless, while this Court may recognize that Harris has a fundamental and cognizable liberty interest in treatment, based on the allegations and admissions by plaintiff in his Complaint, this Court also determines that there has been no procedural or substantive due process violations at this time.

With respect to Harris's right to procedural due process, there does not appear to be any basis to plaintiff's claim that there has been a categorical denial of therapy due to his transfer to EJSP's administrative segregation unit.  In Leamer,

the Third Circuit, relying on <u>Sandin</u>, found that Leamer would
face "significant obstacles" in establishing a procedural due
process claim based on his placement on RAP (restricted
activities program) status because the mere fact of placement in
administrative segregation is not in and of itself enough to
implicate a liberty interest.  <u>Leamer</u>, 288 F.3d at 546.  In the
instant case, Harris will not actually be confined in
administrative segregation for the purpose of punishment, but
rather, he and the other SVP residents at the Kearny facility
will be transferred to a unit at EJSP separate and apart from the
convicted prisoners.  Moreover, there is no absolute denial of
treatment, only a projected estimation that treatment might be
delayed while the transfer takes place and living quarters are
made suitable for the residents.

     This Court likewise finds no substantive due process
violation at this time.  Substantive due process prevents the
government from engaging in conduct that "shocks the conscience,"
or interferes with rights "implicit in the concept of ordered
liberty."  <u>Glucksberg</u>, 521 U.S. at 721.  Under this standard,
Defendants' actions in denying Harris his statutory right to
treatment will be found unconstitutional under the Fourteenth
Amendment if they were so arbitrary or egregious as to shock the
conscience.  <u>See</u> <u>Leamer</u>, 288 F.3d at 546-47 (substantive due
process claim alleging inadequate treatment for committed sex
offender "must focus on the challenged abuse of power by
officials in denying [the plaintiff] the treatment regimen that

was statutorily mandated and was necessary in order for his
condition to improve, and thus for him to advance toward
release")

Here, despite Harris's initial allegation, defendants have
not categorically declined to provide any mental health treatment
to the SVP residents at EJSP, but only projected a short period
for disruption of treatment so as to accomplish the transfer
and/or renovation of the segregated unit at EJSP.  Thus, this
Court cannot readily conclude that Defendants' actions were
conscience-shocking and in violation of Harris's substantive due
process rights.  Indeed, plaintiff's allegation before his actual
transfer to EJSP is merely speculative and it is not readily
apparent that treatment would be disrupted for a significant
time.

Thus, the Court concludes that treatment has not been denied
to the SVP residents as alleged because there is no demonstrated
interruption of adequate treatment that would rise to the level
of a constitutional due process deprivation as alleged.  Any
deviation in providing treatment appears to be speculative and
merely temporary to accomplish the transfer and renovate the SVP
quarters at EJSP.  Therefore, this Court concludes that the
alleged short-lived disruption of therapy and treatment, if any,
has not been shown to be so egregious as to render mental
treatment at EJSP conscience-shockingly deficient.

Accordingly, Harris's claim alleging inadequate treatment
will be dismissed without prejudice for failure to state a

cognizable claim of a deprivation of a constitutional right at this time.

V.   CONCLUSION

For the reasons set forth above, plaintiff's Complaint will be dismissed without prejudice, in its entirety as against all named defendants, for failure to state a claim at this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiff may seek leave to re-open this case to file an amended pleading to cure the deficiencies noted herein.  An appropriate order follows.

STANLEY R. CHESLER
United States District Judge

40